LORETTA WIEDEWITSCH HUNTLEY, SPECIAL ADMINIS-
TRATRIX OF ESTATE OF LOUIS WIEDEWITSCH, v.
WM. H. ZIEGLER COMPANY, INC. AND OTHERS.
OSCAR B. BRANDT, INDIVIDUALLY AND d. b. a. BRANDT
OIL COMPANY, AND BIWABIK MINING COM-
PANY, APPELLANTS.[1]

December 29, 1944.

Nos. 33,716, 33,717.

[1]Reported in 17 N. W. (2d) 290.

 

*Gillette, Nye, Harries & Montague,* for appellant Biwabik Mining Company.

*Cummins & Cummins,* for appellant Oscar B. Brandt, individually and *d. b. a.* as Brandt Oil Company.

*Faegre & Benson, Paul J. McGough,* and *John A. McEachron, Jr.,* for plaintiff-respondent.

*Dell & Rosengren,* for respondent Wm. H. Ziegler Company, Inc.

MAGNEY, JUSTICE.

On April 16, 1941, Louis Wiedewitsch was an employe of the village of Princeton. On that day, he died instantly from an injury which arose out of and in the course of his employment. The provisions of the workmen's compensation act applied. Plaintiff, as special administratrix, brought this common-law action against defendants to recover for his death, claiming that the accident was caused through their negligence. The action was dismissed by plaintiff as to defendants Caterpillar Tractor Company, a corporation, and Firestone Tire & Rubber Company, a corporation. The court directed verdicts in favor of the defendants Pickands, Mather & Company, a partnership, Corsica Iron Company, a corporation, and Wm. H. Ziegler Company, Inc. The jury returned a verdict for plaintiff against the defendants Biwabik Mining Company, a corporation, and Oscar B. Brandt, individually and doing business as Brandt Oil Company. The Biwabik company and Brandt separately appeal from the orders denying their alternative motions for judgment or a new trial and from orders denying their separate motions for a new trial in favor of plaintiff and them and against defendant Wm. H. Ziegler Company, Inc.

The issues involved necessitate a lengthy, detailed recital of the facts.

Wiedewitsch was employed by the village of Princeton in maintaining and cleaning the streets. The village had purchased a grader from the Ziegler company. It was used for the purpose for which it was designed and bought. On April 16, 1941, at a filling station, decedent was putting air into the left rear tire. It exploded, and Wiedewitsch was instantly killed. Jens Peterson, the operator of the grader, had set the air gauge at 58 pounds. That it was a low-pressure tire was imprinted on the rubber. On the rim was stamped: "Inflate to twenty-eight pounds." In the explosion, the beading or edge of the metal rim was blown off. At the trial, this beading was designated Exhibit C, and the balance of the rim Exhibit D. As indicated, the two exhibits constituted the complete metal rim before the explosion. They comprised one unit. Upon examination after the explosion, it was found that the beading (Exhibit C) had been badly mutilated. The tire and rim weighed 230 pounds. Ralph Dowdell, professor of metallography at the University of Minnesota, a witness for plaintiff, described it thus: "There are plenty of marks on the top surface. * * * Indicating that someone has done a lot of mechanical work on this surface; by pounding or whatever it is; there is lots of ways of doing it; they might even have put it under a drop hammer, from all we can tell; *it is certainly mutilated.*" (Italics supplied.) It was pounded heavily. Later on he said: "* * * however it were done and what kind of an instrument is beyond me; there are lots of ways of doing it; but this was thoroughly abused somehow," and "you could not possibly hit this rim and make a mark of that depth without bending the flange; it couldn't possibly be done." The number of marks or dents on the surface of the beading at that time was estimated to be up to a hundred or more. They were so plain that they were readily observable to the naked eye at a distance of from 10 to 12 feet. Professor Dowdell was asked what, in his opinion, caused the beading to break away from the rest of

the rim. He said it was caused by fatigue cracks which were definitely started by the deformation of the rim. He continued:

"All right, while this [Exhibit C] was being abused some of these fatigue cracks got started; just a nick on the outside is all it takes; and while these rims are going down the line in service, they are waving, of course, and these cracks get larger and larger in time; that's all there is to it."

He examined the beading (Exhibit C) under the microscope. It showed old and new breaks or cracks, 50 percent of area, old breaks, and 50 percent of area, new breaks. Thus 50 percent of the cross-sectional area had previously broken. Some of the old breaks had gone all the way through the rim. There were 13 old cracks or breaks altogether. These old breaks are "fatigue breaks." In common language, it is called "crystallization." These breaks progress gradually with stress. The more the grader was in operation, the more the rims would spread and the more the breaks would open up. The cracks correspond with the matching ones on the rim (Exhibit D). The longest old crack was about eight or ten inches in length. This crack, or fracture, as Professor Dowdell preferred to call it, was caused by very heavy pounding. In order to see the breaks or fractures, it was necessary to take the tire off the rim. According to the witness, it would take a person of "fairly decent sight" and a knowledge of "what to expect" to find the fractures. He was asked:

"Q. When a piece of metal receives the amount of pounding that Exhibit C appears to have received, what have you to say as to the kind of inspection which should be given that piece of metal?

"A. It should be inspected; if anybody in the business could see a piece of metal deformed this way or mutilated, or whatever you want to call it, the natural thing to do is to inspect it carefully.

\* \* \* \* \*

"Q. In other words, if I understand it, a given blow may or may not cause a fracture?

"A. It depends on the magnitude of the blow, of course.

"Q. And taking the blow, then the test must be to determine whether or not there is an initial fracture?

"A. Yes; in the case where you see lots of deformation, though, as in this case, anybody should be on their guard to look and see whether or not there is any initial fracture.

\* \* \* \* \*

"Q. In other words, you say that when one sees a beading on a rim that has had the beating that this thing has had \* \* \* then one should immediately test?

"A. That's right.

\* \* \* .\* \*

"Q. Are these cracks you have described—these 13 pre-cracks or these old cracks—are they observable when the tire is attached to the rim?

"A. With careful inspection, yes.

"Q. While the tire is blown up and on the rim?

"A. No; no, not unless they go through; then if anyone would sandpaper around the edge, of course, they would find it."

He said that if the force is below the endurance limit it would not affect the rim or bead in any particular whatever. Not every dent or nick on a rim starts a fatigue crack. It depends on the shape as well as the location of the dent. Again he said:

"A. Because we had only 13 initial cracks; and we have, oh, maybe one hundred or two dents.

"Q. So there are many dents on Exhibit C that did not produce any fatigue cracks at all?

"A. Yes."

Speaking of the age of these cracks or fractures, he said:

"These so-called fatigue breaks—the same as crystallization— they ordinarily run from, oh, maybe one month, oh, maybe up to a year and a half, as far as that goes; that depends, of course, on the stress; \* \* \* these breaks, you see, are the type of break that progress gradually with stress."

Then he was asked:

"Q. Can you form an opinion as to the age of those cracks of those 50 percent—that cover 50 percent of the area of Exhibit C?

"A. They were pretty well rusted; those old parts, when I first saw it; it showed the typical fatigue rings, indicating that they may have started that way; and I would say they would be, oh, maybe sometime up to a year old perhaps."

He was asked how he went about determining the age, and said:

"A. The relative age is determined by the general amount of corrosion that is on the crack.

"Q. Well, do you take some fixed standard of erosion [corrosion] and then determine the age that way?

"A. No, we have no regular scale that we can use; it's just a matter of experience.

"Q. Well, were you able to determine with any definiteness the age of any particular fatigue crack in April 1941; that is, to a period of a month or a day or anything like that?

"A. Not to a day; we cannot determine—or probably to a month so we usually—when we have an old crack, say it's somewhere between a couple months or a year, maybe 18 months.

"Q. Then that isn't a very definite determination of the age?

"A. Not like the Brinell hardness, no, nothing like that."

As to the age of the pounding marks on the beading, he was asked:

"Q. Could you tell whether that pounding on the bead had occurred within two months, six months or 18 months from the time you made the examination?

"A. No, except for the rust; the pounding was done, of course, ahead of the rusting; it was rusty on top of the pound marks.

"Q. Well, what was your conclusion, then, as to the pounding marks; as to the age of the pounding marks, from the time you made the examination in April 1941?

"A. I will say that the pounding marks are relatively old; they were not new when I received them. Now as to the exact age, I

would not like to state, because it would be impossible for anyone to state, of course.

"Q. You couldn't state, then, within six months of the age of those marks?

"A. Possibly not."

It is evident from the testimony of Professor Dowdell that it is impossible to determine with any definiteness the age of a fracture or crack. He states that the relative age is determined by the general amount of corrosion on the crack. That again depends upon conditions more or less favorable to producing corrosion.

We have thus detailed the facts of the accident, the mutilation or defect of the beading as described by Professor Dowdell, a witness for plaintiff, and his opinion as to the probable cause of the cracks or fractures and their age.

The jury found that the negligence of defendants Biwabik Mining Company and Oscar B. Brandt was the proximate cause of the explosion and awarded plaintiff a verdict against them. It becomes necessary, therefore, to consider the testimony upon which such verdict is based. It is evident that the beading at the time of the accident was in a defective and dangerous condition; and the question here is whether or not the evidence supports the finding that the defendants named are legally responsible for that condition.

On April 19, 1940, a new caterpillar motor grader was taken up to the Corsica mine near Biwabik, about 70 miles from Duluth. That year, the Biwabik company and the Corsica company changed over from a railroad operation to a truck operation in the Biwabik and Corsica mines. For purposes of trial and demonstration, the Ziegler company loaned this grader to the mining companies for an indefinite period. If it suited their needs, it was to be purchased and used by them in the maintenance of the roads for truck operations. It was operated in the Corsica mine for three days and then taken over to the Biwabik mine. While it was at the Biwabik mine, it was operated most of the time by Victor Bymark, a serviceman at the mine. On April 29, 1940, a railroad spike

penetrated the casing. It and the rim upon which it was mounted were removed from the wheel as one unit and taken to the repair shop of defendant Brandt at Virginia.. The unit came back on May 4 and was put on the wheel by Bymark. The only tool he used to take it off and put it on was a wrench. There was no pounding on the beading by him. On May 4, he saw six to ten nicks, marks, or dents across the beading and the lock ring, scattered here and there, which were observable at about four feet, but the rim looked all right. He did not observe any marks before it was sent over to Brandt, so does not know whether they were there then or not. He had previously stated that there might have been more marks on the beading, but at the trial he still thought there were from six to ten. At the trial he saw that the beading had then hundreds of marks on it and said he had never seen such marks on it before. The original marks were sharper and had been pounded out. On May 28, 1940, the tire and rim, as one unit, were again taken to Brandt at Virginia to have a new tire put on. A new casing was taken along at the time. Bymark put the tire and rim back on the grader the second time, but did not take it off. He did not examine the beading the second time. At no time did he take the casing off the rim, and he also says that at no time did he use the sledge in any way in connection with the rims or tires of the grader. Plaintiff's counsel in his brief claims otherwise, but we find nothing in the record to substantiate his claim. The Biwabik company had no tools or equipment for repairing tires until after the grader had been taken away. Walter Manley, head serviceman employed by the Biwabik company, had taken off the tire and rim from the wheel when they were taken to Virginia to have a new casing put on in place of the one that had been punctured by the railroad spike. He did not take the casing off the rim. He did not inspect the rim and did not notice whether it was pounded or not. Thomas Veralrud, an employe of the Corsica company, took the tire and rim over to Virginia the first time and brought them back four days later. He had helped Bymark take them off the wheel. He also took the tire and rim to Brandt's

on May 28, 1940, to have the new tire put on. On May 30, he took the tire and rim back to Brandt and had the tire reversed on the rim. The treads had been put on the wrong way. He did not see any marks on the beading similar to those on Exhibit C while it was in the possession of anybody. It was not pounded. He did not give it a close examination, but says he did not notice any pounding marks, and states that there were no such marks on the rim at that time. Abe Mathews, general superintendent of Pickands, Mather & Company, which operated the Biwabik and Corsica mines, saw the grader just before it was taken away from Biwabik on July 26, 1940. He was about six feet from the tire and beading and did not notice any hammer marks or any kind of marks on the beading and did not know of any damage to the rim when the grader left. He said that "if that rim had been in that condition [the condition of Exhibit C], I would have noticed it."

The foregoing covers all the testimony bearing on the way the tire and rim were handled or managed by the Biwabik company while they were in its possession. At no time was the casing removed from the rim by employes of the Biwabik company, and at no time was it placed on the rim by them. Every time an operation like that became necessary while the grader was in the possession of the Biwabik company, the tire and rim ensemble was taken over to Virginia and the work performed by Brandt's men. Consequently, no occasion arose for any employe of the Biwabik company to pound the beading on the rim. The only testimony that there were any marks on the beading and the retaining ring while the grader was in the possession of the Biwabik company is that of Bymark, and he describes the few he said he saw as being different from any of the hundreds on the mutilated beading, Exhibit C. He said he did not know whether the marks he saw were on there when the grader first came to Biwabik. No other employe of the company testified to seeing any hammer marks on the rim.

We shall next consider the testimony as it relates to the work done on this tire and rim by defendant Brandt. As stated, the tire and rim were taken to his shop the first time on April 29, 1940.

At that time, Brandt's men removed the casing from the rim and vulcanized the part damaged by the railroad spike. Then it was sent down to Minneapolis to have the vulcanizing cured. After it returned, they put the tire on the rim, and it was called for by the Biwabik company. On May 28, it was brought back again to have the damaged casing, which had been vulcanized, taken off the rim and a new casing put on. Then, on May 30, it was again taken to Brandt to have the tire reversed, as the treads had been put on the wrong way. Thus Brandt had removed the tire from the rim three times and put it back three times. Brandt had also put three patches on the tube the first time it was brought in. Veralrud, the employe of the Corsica company who took the tire and rim to Brandt, did not observe how the tire and rim were separated and put together the first time they were brought in. When the new casing was put on the second time the tire and rim were brought in, he did not watch closely the work going on, but he was present. Tire tools and a three- or four-pound hammer were used. There was some hammering on the rubber tire itself, but he saw no markings of any kind from the hammer on the beading. He said he saw no one hammer the rim itself. The pounding was not hard. When tire and rim were brought back to have the tire reversed on the rim no hammer was used. It went on easily. Only two days before, the casing had been removed from the rim and replaced. Glen Carlson, who had been in the repair business 14 years, said he used tire irons and a regular three-pound tire hammer to take the casing off the rim on April 29, 1940, the first time they were brought in, but he did no pounding on the rim. It took seven or eight blows of the hammer to knock the tire off. When replacing the tire over the steel beading, he struck eight or ten blows of the hammer. In using the hammer, he was trying to strike the rubber portion of the tire only. When striking the tire, the hammer comes about an inch and a half from the steel beading. He does not remember striking the steel beading. On May 28, he removed the old casing and put on a new one and had no trouble getting the tire off. He did pound on the retaining ring five to

eight times, but claims he did not pound on the bead of the rim. He also did some pounding the second time the same as the first. He does not remember seeing any marks on the beading at any time when it was brought in or taken away. No beading like Exhibit C, with the marks shown on it, ever came into Brandt's or left there. These marks can be seen 10 or 12 feet away. He says he never saw anything like that. One Wernecke changed the one tire around. A hammer was used to tap the tire bead, but he said he did no pounding on the steel bead or rim.

The foregoing summarizes all the material testimony covering the handling of the tire and rim while in the possession of the Biwabik company and all the direct testimony relative to the treatment of the tire and rim by Brandt's employes while they were in the Brandt shop.

The grader was taken back to Duluth on July 26, 1940, by George Langer, a serviceman employed by the Ziegler company. While the grader was at Biwabik, 150 hours were put in by the operator, whether it was idling or operating. The number of hours during which the grader itself was operating was considerably less than 150. The meter shows only the number of hours the motor has actually operated, and that is computed by the engine's revolutions. Before Langer started out from Biwabik, he checked the tires for pressure, using a gauge. The air pressure in the rear tires was 28 pounds. He made no inspection of the rims, but noticed nothing wrong with the rims or wheels and saw no marks on any rim. The rims and tires were pretty muddy. The valve was at the right side of the rim. George H. Bush, sales representative of Ziegler's, who made the arrangements for the demonstration of the grader at Biwabik, saw it after it was brought back to Duluth. He did not inspect the tires or wheels at that time, but observed them and saw nothing wrong or unusual. He walked around the grader and made a casual inspection of the tires. He observed nothing wrong with the rim on any wheel. Jude G. Lewis, branch manager of the Ziegler company at Duluth, stated that when the grader was returned to Duluth on July 26, 1940, the tires on the rear wheels

showed some wear. Pickands, Mather & Company in Duluth agreed to furnish one new casing to replace the tire that showed the more wear. Mr. Mathews, its superintendent, made a careful examination of the tires and observed nothing wrong with any rim. He saw no such marks as are on Exhibit C, and no employe reported to him any markings of the kind on any rim on any wheel of the grader. He made no separate inspection of the rim in fact. In the courtroom, he could see the marks on Exhibit C and saw no such markings while it was in the shop at Duluth. When the grader arrived at Duluth, Ray Rasmussen, Ziegler shop foreman, ordered the grader washed. He said that it was a little dirty. He did not inspect tires or rims. William Wilson, an employe of Ziegler, then washed the grader and painted it. He saw no marks of pounding or other marks on the beading or the left rear rim. He painted the inside of the left rear wheel with a sprayer. He worked within three feet of it and saw no such condition as Exhibit C is in. If he had seen such marks he would have reported it to the shop foreman. Frank Gappa, a service mechanic employed by the Ziegler company, brought the grader from Duluth to Minneapolis on August 13, 1940. He paid no attention to the condition of the rear tires and saw nothing wrong. Carl Edmon, a Ziegler salesman, took the grader up to Little Falls in August 1940. He demonstrated it there for five days. Then he took it to Park Rapids and demonstrated it there for five days. From Park Rapids he brought it back to Minneapolis. While at Little Falls, he noticed the valve in the left rear tire was being pinched between the rim and the wheel. It was bent backwards. The rim had been put on the wheel improperly, and the hole was pointing toward the inside instead of the outside. He turned the rim around on the wheel but did not remove the tire. At Little Falls also, he put a new tire on the right rear wheel. He does not remember noticing anything about the rim except that it was on backward. He did not notice any pounding of any kind, or hammering, or marks on the rim that day, or at any time. He found nothing wrong with the left rear rim, but made no close examination of it. The grader

was taken to Princeton December 7, 1940. It was there for about two months on a rental basis and then taken back to Minneapolis January 27, 1941. Ashley Arndt, serviceman of Ziegler's, drove the grader to Princeton on December 7, 1940. When he took it out he checked the tires and rims. He put 28 pounds of pressure in the rear tires. He said he must have told Jens Peterson about the 28 pounds. He was asked:

"Q. Tell this jury whether or not on any portion of that grader you saw any rim that was hammered anything like that which you see in front of you and which I am holding up here in court? [Exhibit C.]

"A. I didn't notice it.

"Q. You didn't see it, did you?

"A. No."

On the witness stand, he was 14 feet away from Exhibit C and could see the marks from where he was sitting. He claims, however, that he had no occasion to look at it. He says he did not look for them. He was asked:

"Q. Take a look at that (indicating Exhibit C); how many marks do you see on that Exhibit C, that bead of the rim?

"A. Well, that would be pretty hard to count them; it's battered down all the way around inside here.

"Q. There are hundreds of marks there, aren't there?

"A. Sure.

"Q. And that's battered and deformed, isn't it?

"A. Yes, it is now.

"Q. Did you see any situation like that on the left rear rim of that grader 212 at the time you tested the air in the left rear tire in Minneapolis just before starting out for Princeton on December 7, 1940?

"A. Did I notice these?

"Q. Yes.

"A. No."

According to the testimony of Ziegler employes, no new or second-

hand rims had been issued to this grader, and there is no record of inspection of rims while it was in Minneapolis. Isaac Kistler, manager of the shipping department of the Ziegler company, said that when a vehicle comes back it is his duty to check it to see whether the tools and equipment and everything is there and what the condition of the vehicle is. As a rule, if he finds anything missing or wrong, he makes a record of it. When the grader came back from Duluth on August 14, 1940, he looked it over but did not examine the rear wheels. His assistant, Earl Clark, made a notation at that time that the right front tire was slightly cut, but no mention was made of the condition of any rear tire. LeRoy Rasmussen, shop foreman of the Ziegler company in Minneapolis, said that there was no change in the rim on the left rear wheel from December 1, 1939, to March 25, 1941. He checked it to some extent when it got back from Princeton and also when it went back up there after they bought it. He claims he did not check the tires and that he does not look for marks or dents in the wheels or rims when sending out a grader on a purchase order. He was asked: "If you find the thing dented up in any respect, don't you go ahead and fix that up when you send it out?" to which he replied: "If we find it, yes." He said he could not say if the grader was sent out with the left rear bead battered or pounded. He said: "I didn't inspect it; I didn't see it; I didn't notice anything like that." Jens Peterson, an employe of the village of Princeton, said he had no flats and did not pound the rim on the tires. At the time of the accident, the right rear wheel had a number of cracks in exactly the same location as where the rust marks were found on the left rear wheel. One was a couple of inches long and he thought wide enough for the insertion of a dime. He was just checking for cracks, and does not remember whether the rim on the right rear wheel had been pounded. From the time the grader was returned from Princeton in January 1941, until about March 17, shortly before it was purchased by the village of Princeton, it was in the shop for several days. Exhibits in evidence show that at that time two lenses, one lamp, one pipe, two cap screws, ten gaskets, one

manifold assembly, one plug, and one tooth were installed. They also show that the case was welded and a spring, a lever, and a plate assembly were installed. A total of 45¾ hours was expended in connection with the work. When the grader was taken to Princeton on December 7, 1940, and turned over to the village on a rental basis, the hour meter indicated it had been operated 130 hours. During the period it was at Princeton on that basis, it was used more than 68 hours. After its purchase by the village on March 25, 1941, and up to the time of the accident, it had been operated 568 hours. On April 16, 1941, the date of the accident, the hour meter stood at 568 hours. A witness testified that the Ziegler company had a record of the number of hours the machine had been operated before it came to Princeton on each occasion. The record was not produced.

From about May 30, 1940, until July 26, 1940, the grader was stored on the premises of the Biwabik company. On the latter date, the Ziegler company took possession of it. The last time Brandt had the tire and rim in his shop was on May 30, 1940. The accident occurred on April 16, 1941. Nothing that these defendants did, or failed to do, after July 26, 1940, could possibly have had anything to do with the accident. The question then is: What did they or either of them do, or fail to do, prior to July 26, 1940, which was a proximate cause of the accident?

As to the Biwabik company, the evidence shows that at no time while the grader was in its possession was the beading pounded by any of its employes. This is the positive testimony of Victor Bymark, the employe who operated the grader most of the time and who testified as plaintiff's witness. The Biwabik company had no equipment at that time to change or make repairs on tires, and consequently had to send the tire and rim to a repair shop, even to have an old casing replaced by a new one and, later on, to have the tire on the rim reversed. The Biwabik company had not placed a single mark or dent on the mutilated beading which was on the grader at the time of the accident, and could therefore not be held responsible for its condition then. Bymark testified that when the

tire and rim were brought back from the Brandt shop the first time he saw six, eight, or ten nicks on the beading. Whether or not they were on there before the tire and rim were sent over to the Brandt shop he could not say. There is testimony that even new beadings have marks on them. The fact that Bymark at one time, more than ten months before the accident, saw six, eight, or ten marks on the beading, while the grader was in the possession of the Biwabik company for demonstration and tryout purposes, is, apparently, in the opinion of plaintiff, sufficient to support a verdict in her favor. And he is the only witness who testified to seeing any marks at all on the beading prior to July 26, 1940. When the beading appeared in court as Exhibit C, it was mutilated and deformed and had hundreds of marks or dents on it. Bymark said that the original marks he saw on it had been entirely obliterated. According to Professor Dowdell, the expert called by plaintiff, there was a total of 13 cracks or fractures in the beading at the time of the accident. Thus only a small percentage of the hundreds of marks or dents produced fractures. And whether or not the nicks or marks seen by Bymark produced a mark or crack is entirely speculative. On that showing, it seems impossible to spell out any negligence on the part of the Biwabik company. There is absolutely nothing which this defendant did or failed to do that was a proximate cause of the accident. It certainly cannot be successfully claimed that it was the duty of the Biwabik company to maintain the grader, or any part of it, after the owner had taken possession of it.

Plaintiff claims that Brandt was negligent in that he placed the nicks or marks on the beading which were seen by the witness Bymark. The employes of Brandt deny this. Let us assume, however, that these nicks or marks that Bymark saw were due to pounding by Brandt's employes. The evidence is that no one saw any nicks or marks on the beading from about May 4, 1940, when Bymark saw them, until after the fatal accident on April 16, 1941. Some marks must have been on there before the latter date, as there were 13 cracks or fractures in the beading, according to Pro-

fessor Dowdell. How old they were was problematical. The estimate as to age is indefinite, as the quotations from the testimony of Professor Dowdell show. It is evident that the quantity of rust on a fractured surface depends on so many factors that it is impossible to estimate the age of a fracture with any degree of certainty. However, the overwhelming testimony is to the effect that the beading was not deformed and mutilated when the grader left the possession of the Biwabik company.

There are two unsolved mysteries in this case. The first one is: When, how, and by whom was the beading mutilated? The other is: Where was the grader and by whom was it operated when over 200 hours of operation were put on the hour meter? The evidence shows that when the grader arrived at the village of Princeton the first time the meter showed 130 hours. When the accident took place it indicated 568 hours. It seems that the records of the Ziegler company could have enlightened the court and jury as to the second mystery. Except for the extensive work done on the grader, the evidence does not disclose the nature of its use from January 27, 1941, when it was brought back to Minneapolis from Princeton, to March 25, 1941, when it was returned to Princeton.

There is no evidence to support a claim that the beading was in such a mutilated condition when the Ziegler company took possession of the grader on July 26, 1940. It does not seem necessary to discuss how the cracks or fractures are developed and how they may be discovered. Professor Dowdell disclosed how they may be found by an expert, although not observable to an ordinary repairman unless the fracture is clear through. A finding that Brandt was negligent must rest wholly in speculation and conjecture and is against the overwhelming weight of the evidence. The damaged condition the beading was in at the time of the trial was readily observable to the naked eye, even at a distance of 10 or 12 feet. The marks seen by Bymark could not be seen on Exhibit C because of the later poundings. The hundreds of marks or dents were later created by unknown persons at an undisclosed time and place and by unrevealed means.

In Robertson v. C. R. I. & P. Ry. Co. 177 Minn. 303, 306, 225 N. W. 160, 161, this court said:

"Verdicts cannot rest on conjecture. The burden was on plaintiff to show that the accident resulted from defects in the car. It is not enough to show that there may have been defects. The evidence must go further and justify an inference that the accident resulted from the cause alleged rather than from some other cause. If it is equally probable that the accident resulted from some cause other than the negligence of the defendant, there can be no recovery. To warrant a recovery the evidence must furnish a reasonable basis for a finding that the accident is more likely to have resulted from the negligence alleged than from other causes [citing cases]."

In Bauer v. Miller Motor Co. 197 Minn. 352, 357, 358, 267 N. W. 206, 209, this court again stated the rules:

"The verdict cannot be based on mere possibility, speculation, or conjecture [citing cases].

"No recovery can be had if it is more probable that the accident was produced by some cause for which defendant was not liable [citing cases].

"If an inference of negligence from part of the facts is inconsistent with and repelled by other facts conclusively shown, negligence is not proved [citing cases].

\* \* \* \* \*

"Proof of causal connection must be something more than consistent with plaintiff's theory of how the accident happened [citing cases]."

Our disposition of these appeals makes it unnecessary to consider whether or not the court erred in directing a verdict in favor of the Ziegler company. For the same reason, neither will the suggestion that we reconsider the rule laid down in American Motorists Ins. Co. v. Vigen, 213 Minn. 120, 5 N. W. (2d) 397, 142 A. L. R. 722, be acted upon. In view of the evidence and such cases as McLeod v. Holt Motor Co. 208 Minn. 473, 294 N. W. 479; Egan

112

Chevrolet Co. v. Bruner (8 Cir.) 102 F. (2d) 373, 122 A. L. R. 987; and Flies v. Fox Bros. Buick Co. 196 Wis. 196, 218 N. W. 855, 60 A. L. R. 357, it would seem that the question of the negligence of the Ziegler company was for determination by the jury and not the court.

The appeals as to the Wm. H. Ziegler Co. Inc. are dismissed.

Orders reversed with directions to enter judgment for defendants Biwabik Mining Company and Oscar B. Brandt, doing business under the name and style of Brandt Oil Company.

